Call the case please. Case number 15-47 people v. Michael Escort. No, we just need the up-line right now. Thank you. Tell us who you are. Okay, let's go. Good morning, your honors, and may it please the court. My name is Robert Hirshhorn. I'm with the Office of the State Appellate Defender, and I'm here this morning representing Michael Escort, the appellant. Now, I'm going to concentrate my argument this morning mainly on the first and the second issue, as I'm sure your honors are aware that these are closely interrelated. Of course, if the court has any questions as to the third issue or anything else, I'll do my best to answer those as well. At the core of this case is one central fact. The state produced no direct evidence that Michael Escort killed Mary Smith. I don't think they'll deny that. What about their circumstantial evidence? The circumstantial evidence, your honors, here is extraordinarily weak. All they have is a DNA link, which establishes one thing and one thing only. Michael Escort had sexual relations with Mary Smith. It doesn't tell you when he had sexual relations with Mary Smith. He doesn't tell you whether he was the first, the last, or in between of the number of people who had relations with Mary Smith. There are some harsh truths involved in this case, and the first harsh truth that's involved in this case is Mary Smith had a drug habit, and she supported it by prostitution. We know from the expert testimony that they found DNA from a number of unknown males, at least three and perhaps as many as five. Michael Escort was clearly identified as unknown male number one. I'm not disputing that, but that's all we have here. Everything else after that is kind of an attempt to fill in the blanks with speculation. There are a lot of facts that I want to get into regarding this. The testing was done 22 years after Mary's death. She was killed in 1989. The case went cold in 1992. The cold case squad picked it up in, I believe, 2010, and the testing was done in 2011. Was there any evidence that there was something stale about the samples? One thing I think that's important in analyzing this, the one thing that I think is stale, is in the state's brief they keep referring to sperm and semen interchangeably, and they're not. Semen is merely the fluid that is used to transmit. One's a sperm fraction and the other's a non-sperm fraction. The genetic testing is actually on a third thing, the epithelial cells. They do a process called differential extraction. It wasn't the testimony of the individual who testified from Solmark Forensics. She talked about non-sperm tests and sperm tests. Yes, and the non-sperm, she also said, was the epithelial cells. I just want to make it clear that what she was testing there was not semen but the epithelial cells. Epithelial cells basically being surface cells. Counsel, can I ask you, as far as the discussion about volume, how many swabs were there altogether? Do we know? I don't believe that anybody got into the number of swabs. I mean, by the time that Selmark got this, the swabs had already been separated from the sticks. Yes. I don't know that anybody testified. I certainly don't recall anybody testifying as to the number of swabs, for example, were there multiple vaginal swabs or simply one. I don't think the record tells us that. Because it's an important point, because the witness burner talks about, you know, many, many, many sperm cells present on the vaginal swab. But we don't know one, two, three, whatever. We have no idea. We don't know one. We don't have a number, if you're referring to the number of sperm, many, many means. Clearly, it's enough that they could do a complete profile. Unknown male number one was a complete profile. Now, and again, I'm not contesting otherwise. Michael S. Burt had sex with Mary Smith. That's undisputed. But Burt testified that because of the quantity of sperm cells found on the vaginal swab that were later identified as being unknown male number one, later was identified as your number one, the amount, the volume was indicative of a recent encounter. I think what she means by that, or it's reasonable to assume, is it's more recent than any other of the contributors that may have been found. And, Your Honor, I think she kind of brought that back a little bit later in her testimony when she talked about things like sperm counts and other things that would affect that. I don't think she ever clearly said that this was the last man to have sexual relations with Mary Smith. And the other thing I'd remind Your Honors is we cannot eliminate, there's absolutely no evidence as to whether she had sexual relations with people who used condoms. If they did, there would be people who could conceivably be much more recent and who simply didn't leave any sperm behind. And we don't have anything in the record sort of further analyzing or further defining what that witness meant about recent. It doesn't mean minutes or hours or days. No, I don't think there's anything. What we have here is that Ms. Burt testified that sperm can survive in the body for up to 72 hours. So our window is at most 72 hours and away. She also testified that you cannot determine when sperm is deposited. Yes, and I think that's an important point here. Again, because we can't tell whether Michael Smith was the last one to have sexual relations with Mary Smith. Counsel, can I ask you, is there any conflict between the testimony of Witness Burt versus Witness Paulson as they talked about what was found on the pantyhose? I don't believe so, and I want to get into the pantyhose because I think that is, again, somewhat crucial in understanding what's going on here. The State told the jury, almost in so many words, that the reason we know that he was the last one is because the only place his DNA was found was in her vagina. But that's not what Kelly Burt testified to. She said that on the pantyhose, when she tested that, she found two or three, a mixture of several unknown males, and she could not eliminate Michael Escort from being one of the contributors to those. That's important here because the State's theory is that she was found without a close-up. He must have been the last one, otherwise it would be on the close, and it could have been on the close. Kelly Burt could not eliminate that. Yet that's not what the State told this jury in summations. Well, actually, didn't she testify that based upon the test on the pantyhose, that no conclusion could be drawn from the analysis of whether either unknown male number one or unknown male number two were contributors? Yes. I'm not saying that she said it was definitely found there. I'm saying that when the State told the jury the only place it was, was in her vagina, not on the pantyhose, that is inconsistent with Kelly Burt's testimony. Well, she didn't say it was on the pantyhose. She just said she couldn't eliminate it. Well, that's a little different than saying it wasn't there. For purposes of proof beyond a reasonable doubt, for purposes of saying he was the last one, her inability to eliminate him from there is very significant. He was eliminated, though, wasn't he, by the State Police, as to the non-sprung sample? I believe there was an unknown male number two, obviously, which would indicate that he wasn't a contributor on that one. And the others, again, because I'm hesitant to say this, I don't mean to be critical of either the State's attorney or the defense counsel here, because the DNA really wasn't in dispute, that he had sexual relations with her wasn't in dispute. Nobody got deeply into the weeds on some of these things. It's important, however, for our purposes here, when all we have is this DNA match in the vagina and the argument that he must have been the last one because otherwise we'd expect to find it elsewhere, that the evidence didn't exclude the possibility that it was elsewhere. Can I ask you, who made the statement, the amount of sperm is a muddy indicia of recency? I put that in the brief. I believe those were my words, Your Honor. Those are your words. That was out of witnesses' words. No, I believe I'm characterizing what the evidence is there. Thank you. If that was in quotation marks in the brief, that's on me. I don't think I did that, though. Thank you. Who was his name, Paulson, from the State Police Laboratory? As to the pantyhose, did he testify that the sample, the non-sperm fraction of the sample, was insufficient to yield information to either include or exclude the defendant as a contributor, or whether the defendant's DNA portion was not found on the sperm fraction of the sample and he could therefore be excluded? I don't recall that, Your Honor. Certainly not in that detail. I will look at my notes when I sit down and try to answer that in more detail when I get up for rebuttal. As I stand here right now, I don't want to answer that and be wrong in doing so. I don't recall that level of detail. But again, I will look at my notes as that. Again, up to five unknown males. We cannot exclude people who used condoms. And the State's case hinges on the fact that he must have been last. There's no evidence to show you that he was the last one. None. So where does the State turn from there? They go to propensity evidence. They bring in one prior from 1991. And as we analyzed in the brief, it would be hard to find two more disparate offenses, both in terms of the victim, an adult versus a child, indoors versus outdoors, night versus day, consensual versus non-consensual. Obviously, with a 13-year-old, it would have to be non-consensual. All these things are different. But the thing I wanted to draw Your Honor's attention to is that they didn't even establish a link between Michael S. Wood having sex with Mary Smith and the homicide. And who? And the homicide. Okay. But what's the standard of propensity evidence? Is it what's relevant as far as the Motus Abrande or one of the other reasons? I think what the courts have told us is that the more similarities, the more they tend to be probative. Right. So generally the similarities. The similarities. But certainly, if you're looking at this in terms of like an MO, there is no MO between these two. All right. But the sexual conduct, is that sufficient? I'm arguing no. Because if sexual conduct by itself is sufficient, then it's an open door. You don't need to do anything else. I don't think the statute is designed to allow you to say one sexual offense is introduced as far as propensity evidence in all subsequent sexual offenses. I think the courts in Donahoe cautioned trial judges to be careful in doing this. And also, let's not forget that the statute also says, also you have to look at the prejudice. The state conceded basically the prejudice. They said we're only bringing in one to reduce the prejudice. An oddly candid concession. They argue harmless error as well? I don't see how this can be harmless. You've got only two things here. You've got DNA that shows he had sexual relationship and there's propensity evidence. There's no other evidence really here to show that there's any connection between the homicide and the sex act. None. So what guidance does a trial court have as far as making determinations to how similar things are? Is there two things that are similar? Three? One? I don't think there is a hard and fast rule on that. I think each case is kind of sui generis. The court is going to look at that and see, is this going to provide guidance to the jury? Is the jury going to be able to derive something from this? And that's why I wanted to address the fact that they can't connect the sex with the killing. So how do we review the use of the preponderance of that? I don't think you even need to get too prejudiced. I would say that based on the first part, whether this is probative, they lose. Because here, if you look at the felony murder statute, he has to be committing or attempting the killing during the forcible felony. They can't say that the forcible felony was attached to the killing here. If you look at the statute, and here I'm talking about 8.2 of Section 7-3, where it talks about first-degree murder and second-degree murder, and again it talks about there being sexual penetration or sexual conduct during the course of the killing. And where is that evidence in this record? I'm not seeing it. If you can't connect it that way, it's just not probative. You don't even have to get to the prejudice half of the analysis. And it's clearly prejudicial. When the evidence is so slight, these things can tip balances. We'll give you some time, Member Bogle. Pardon? Thank you. Thank you, Your Honor. State. May it please the Court. State's Assistant State's Attorney Talisha Norman Jackson on behalf of the people of the state of Illinois. The people have already met its burden in this trial. The evidence established a timeline that allowed the rational trial fact to conclude that the defendant is the individual who murdered Mary Smith on October 2nd. What's the proof of the timeline? The proof of the timeline is the fact that her body was found prior to 8.45 a.m. and at the point that her body was examined, no rigor mortis has set in indicating that she had only been dead for several hours, as our experts testified to. In addition to that, we have large amounts of semen and sperm cells found in her body, indicating that it was a recent encounter. All the other DNAs found, such as in her peening holes, were all prior encounters. The only DNA of full profile matching the defendant was in her body. In addition to that, her body never moved after that point, either the sexual encounter. Her body never moved after what point? At the point that the sexual encounter occurred. Who says that? The evidence supports that. What evidence? The evidence that the semen, and we have experts who testified to this, the semen ran down into her anus, which does not occur that if the body were upright or she had been standing, it would have ran down her leg. The fact that it ran down into her anus and that the semen was found present there as well, the fact that other evidence points to her body not moving, such as the blood running down the side of her face, the blood spatter on her chest indicating that she was choking and spitting and that's where it landed. I think there's more than sufficient evidence that she may very well have been murdered where she was found. I'm trying to find who testified that she had sexual relationships where she was found. Who testified to that? Can you repeat the question, Your Honor? I think there's more than sufficient evidence she may very well have been murdered where she was found, but who testified that she had the sexual relations where she was found? There's no direct testimony to that. What are we to do with the testimony of the medical examiner that she had lacerations on her back indicative of her body having been dragged? That's correct. She did have injuries to her back that her body had been dragged. The point, what the evidence shows is that the murder and the sexual encounter happened in the same time frame. The last individual to be with her was the defendant and that was the individual who murdered her. But what you just said, the last individual to be with her was the defendant. That's correct. That's all hanging on the testimony of Kelly Bird, isn't it? That's correct. That's the only thing you've got to support that statement she just made. That's correct. If the... Where she says indicating a more recent sexual encounter. That's correct. That's what your case hangs on. Yes, and also what Kelly Bird testifies to is that with the amount of semen present, if Mary had the opportunity to put those pantyhose back on, his DNA would have been found in those pantyhose. She didn't infer, didn't testify to that. Your Honor, and I quote from the record. Pantyhose didn't have, she didn't establish that his DNA profile was found on any of the samples in the pantyhose, but she never testified that she had put them on. Your Honor, she testified not exactly that she never put them on. She testified that you would expect to see semen transfer into the crotch area of the garment if that garment was put on after sexual contact. You'd expect to see. That's correct. And can I ask you, she said semen there, right? That's right. She didn't say sperm? No, she didn't say sperm. There's a difference between those two. There is a difference between the two. How does one know semen is there versus sperm? Well, both were tested. The pantyhose were tested for the presence of semen as well for the presence of sperm. And how was that test done? Your Honor, I cannot tell you the scientific specifics of how semen is tested as I can tell you how the sperm is tested. I know, but did she testify as to how the semen was found? What the chemical process was to determine that? Was there any testimony along those lines? I don't recall. I do recall the testimony as to the differential extraction of the semen from epithelial cells and all other cells, but as to testing for semen specific, I'm sorry, for sperm. So let me ask you this question. She testified that there were many, many sperm cells present from the defendant in the vagina. Is that right? That's correct. How do we quantify many, many sperm cells? She does not testify as to how we quantify that, but she does testify that it is indicative of a very recent encounter. Well, don't men have different sperm cell counts? Your Honor, I'm not a scientist. I don't know. I mean, I think that's a fair assumption. She does not clarify who may have what types of sperm counts or how that would factor into her determination. But she did testify, as Your Honor said later in her testimony, that there were a whole bunch of other things that would go into the question of who was, you know, how recent the encounter was, what's the sperm count she talked about. But more importantly, she said, she specifically testified, you cannot tell when sperm is deposited. It's within 72 hours, according to her. It'll live. That's correct. She did testify that no time could be specified. But what she does also testify to, importantly, is that semen does degrade over time. I mean, I'm sorry, yes, semen doesn't stay in the vagina forever, and over time you will see less and less of it, as opposed to if it's on a garment, when it's dry, it stays there. What we have is a large amount of semen and sperm cells found inside the victim's body that has no time to disintegrate. That's why she finds so many sperm cells in that vaginal swab, because it had no time to go anywhere. It depends on how you quantify many, many. That's all she said, many, many. Your Honor, she doesn't just testify to the many, many sperm cells. She also testifies to the amount of semen present as well. Her statement is that there was a sufficient amount of semen present on the tube from the vaginal swab to get a complete male profile, again indicating that there was a sufficient amount to conclusively link the DNA to the defendant, again indicating that it was a recent count. The defendant disputes the fact that the test established that his DNA profile was found on the samples taken from the vaginal swab. She doesn't dispute that. She doesn't dispute that he had sex with her. Right, and the point I'm getting to, Your Honor, is that it's not just the many, many sperm cells. It's the amount of semen found as well that indicates that it was a recent encounter. Again, reminding the Court that the evidence is taken in the light most favorable to the people. All the same evidence was put before 12 jurors. All the same issues were raised. All the same defenses, and they were able to make a reasonable inference based on this timeline and the evidence that the defendant murdered the victim beyond reasonable doubt. Right there, Mr. Northern Jackson, when you talk about reasonable doubt, the State's position is that based on this evidence, the jury could reasonably find beyond a reasonable doubt that he committed this murder. And your case is hinging on this one man versus these other four unknown men who are mixed into the evidence here. At what point do we have reasonable doubt? If there's 10 men's cellular data in the mix or 20 or 25, at what point do we start getting reasonable doubt? Your Honor, I don't believe you can quantify it in that manner. Again, it's in the light most favorable to the people. And in addition, we're not required to refute every reasonable hypothesis of innocence. What we have here is enough circumstantial evidence that establishes a timeline that allows the jurors to draw a reasonable inference that all of this happened within the same timeframe. We have fresh semen, a large amount of sperm count, and we have the victim's dead body. And his DNA is never transferred to her pantyhose. So her body never moved after the sexual encounter. I don't understand how you can say her body never moved after the sexual encounter. Do you mean she was murdered first and then he had sex with her? She was dragged first and then he had sex with her? Or he had sex with her, then she was dragged, then he murdered her? Which is it? Let me clarify. Around that time that the sexual encounter, well, the most obvious answer is her body did not move after that sexual encounter. Ma'am, if her body never moved after the sexual encounter, is it your suggestion he's a necrophiliac? Your Honor, again, that's a... The problem we have here is here's a woman who was choked to death. Her laryngeal passageways were crushed. She had trauma to the face to the point that I think her orbital bone was broken. That's correct, Your Honor. She was dragged so badly that the medical examiner could say the body was dragged over some rough surface.  Your Honor, the evidence suggests that it occurred just before that point. And again, all of this happened within the same time frame. But the fact of the matter is that she was strangled, she was beaten, she was murdered, and there was a sexual encounter that happened within that same time frame. And that when that sexual encounter concluded, whether that was just before the beating or just after, her body never moved. Logic would have it that the sexual encounter took place where the pants and the pantyhose were found, somewhere else other than where her body was found. Your Honor, that's not exactly reasonable. Her clothes were not found near her body. They were found on the roof. That's correct, on the nearby roof. Again, if her body had moved after that sexual encounter because her body was found on the ground in a different place, if her body had been in an upright position at any point after the clothes had come off or after that sexual encounter happened on the roof, the semen wouldn't have run down to her anus. Again, gravity would have forced it to run down her leg. Do we know whether any of the semen or sebum ran down her leg? Were swabs taken of her leg? The swabs were taken of her vagina and her anus. And Mrs. Berg did testify to that being indicative of the fact that she was in a lying position. And whose semen was it? That semen belonged to the defendant. And again, semen, how was that measured? What's the scientific way of measuring what semen and who it belongs to? We're talking about cells, not DNA. Is it DNA? It is measured by DNA. Again, I think what was taken was a swab of the vagina and we did differential extraction and we have the semen part of the sperm cells that matched the defendant and his DNA was found in her vagina. We know that his DNA was found in the sample taken from the swab. I find nothing in this record to suggest any swabs were taken of her leg or anyone testified that there was no semen on her leg. There is testimony that one would expect semen to be found in her vagina or in her anus if she was in a specific position. But there's no testimony in this record that there was no semen or sperm found on her leg. That's correct, Your Honor. But again, taking evidence in the light most credible to the people and drawing it gives a reasonable inference that the semen, since it ran down into her anus, that that's the position she was in. Wait a minute. His semen wasn't found in her anus. The semen that was found belonged to the defendant. Well, the sperm cells, the DNA was matched to the defendant. There was no DNA evidence of any other individual present. You're correct. Was there any analysis of the sample of the swabs taken from her anus that identified the defendant as a contributor? Not specifically, Your Honor. Specifically, the answer is no. They tested it, and they said no. That's correct, Your Honor. But there was only one. The semen found in the victim only belonged to one person, and that was to the defendant. Moving on to the ---- Counsel, go ahead. Go on. Go ahead. Counsel, let me ask you about the pantyhose. Did Witness Bird testify that the defendant could not be excluded from any of the whatever was found on the pantyhose? He could not be excluded from that. That's not correct, Your Honor. What Mrs. Bird testified to the pantyhose was that as to the sperm fraction, the defendant was excluded. His DNA was not found there. As to the non-sperm fraction, which are cells, anything other than the sperm, it was inconclusive, which simply means that there was not enough to even make a comparison. As to the sperm fraction ---- I want to correct you because I think you've got something mixed up here. I think Mrs. Bird testified that as to the samples taken from the pantyhose, that no conclusion could be drawn from either the sperm sample or the non-sperm sample. That was her testimony. Examination of the non-sperm fraction from the sperm across the victim's pantyhose revealed from two people at least one unknown male, however, no conclusion could be drawn from the analysis as to whether either male number one or male number two were contributors. The sperm fraction revealed that three individuals were the source, including at least one unknown male. Again, no conclusion could be drawn as to whether the male number one or male number two were contributors. It was Mr. Paulson that testified that he compared the defendant's DNA profile with the non-sperm fraction of the sample from the pantyhose, and it yielded insufficient information to either include or exclude the defendant as a contributor. However, the DNA was not found on the sperm fraction of the sample from the pantyhose, and he then concluded that the defendant could be excluded as a contributor to the sperm fraction. That's correct, Your Honor. I did mistakenly mix up the testimonies in that instance. But in addition to the timeline and the fact that the defendant's DNA was not found in the pantyhose, we have this propensity evidence that the trial court found was similar and relevant enough to show the defendant's propensity to commit sex acts during post-sternulation. We have the stimulation of the victim, Tayshia Pearson, and the victim here, Mrs. Mary Smith. Doesn't that fall apart, though, when you realize one is consensual and one is non-consensual? It is the age of the victim? No, Your Honor. The age of the victim, what we in a nutshell have here, are two vulnerable women, both smaller than the defendant, both taken advantage of by the defendant, one manipulated into a sexual encounter and then once refused was strangled, another that perhaps may have been consensual but turned violent. What we have here is the fact that he did strangle her around the same time as the sexual encounter and that he has propensity to commit sex acts, not necessarily a sexual assault, but sex acts during post-sternulation. Counsel, thank you. Please hold. A couple of brief points. I think Your Honor's hit on many of the things I was going to raise. The notion that she died right after the sex. We've got the clothes on the roof of a building. We've got evidence that her body was dragged. And the argument that I'm hearing here is that it would have been on her anus because of gravity. I'm not sure I follow that in the sense that I don't know whether, you know, what positions they were in when they had sex in the first place, and I don't know the position that she was in when she was dragged. Was it only on her back? I know there were scratches and abrasions on her back. We also have injuries to her head. I don't know how she was dragged. I don't know if she was carried part of the way. The argument that there must have been sperm on her anus had he not been the last doesn't have any more evidentiary support here than anything else. Counsel kept referring again to semen. She tested the semen. She tested the semen. The test, the key test here, the tests that were done both by Paulson in, I think it was 2012, and by Byrd in 2011 are more than 20 years after the event. There is no semen. The fluids have evaporated. They may be dried as a stain in the pantyhose, but what you're testing for is DNA. Semen is a fluid. You're testing the epithelial cells. You're testing the sperm cells. Epithelial cells, false cells, will have 46 chromosomes in a 23-23 match. The sperm cells, you're looking at 23 chromosomes. They're male gametes. But that's what you're testing for with all these genetic tests. You're not testing for semen. It's important that Your Honors maintain that distinction because so much time passed between the time of the homicide and the time of that crucial testing. Ultimately here, however, what we've got is this doesn't establish guilt beyond a reasonable doubt. That reasonable doubt standard, while we're deferential to fact finders and all that, it's still what separates us from round-up the usual suspects. You've got to prove it. If you're going to tell this jury that we know it's him because he was the last one proven, provide the evidence. Show that this was done closely to the homicide, that there's some nexus between the sex act and the death. We don't even have that. As a result, you cannot affirm this conviction. So for all the reasons stated in the briefs, we'd ask you to reverse this conviction. At least we should say we should not. We cannot. We certainly can't. We have to. Well, I may, from my perspective, cannot. From Your Honors' perspective, it might be different. I'm not trying to put words in your mouth. Unless the Court has any questions on the other issues, thank you very much. Counselors, thank you. And that will be taken under advisement. And if any more issues, we'll reverse. Court is adjourned.